SO ORDERED: February 6, 2026.



James M. Carr
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | |
|---|---|
| IN RE: ) | |
| ) | |
| ROOSEVELT LEVON SMITH, ) | Case No. 25-00160-JMC-7 |
| ) | |
| Debtor. ) | |
| _____ ) | |
| ) | |
| PETERMAN HEATING, COOLING & ) | |
| PLUMBING, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Adversary Proceeding No. 25-50020 |
| ) | |
| ROOSEVELT LEVON SMITH, ) | |
| ) | |
| Defendant. ) | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

This adversary proceeding came before the Court for a bench trial on November 3, 2025 (the "Trial"). Plaintiff Peterman Heating, Cooling & Plumbing, Inc. ("Peterman") was represented by counsel Bradley J. Buchheit. Defendant/debtor Roosevelt Levon Smith ("Debtor") proceeded *pro se*. At the beginning of the Trial, Peterman orally dismissed Count III of the *Complaint (a) to Determine Dischargeability of Certain Debt and (b) Objecting to*

*Discharge* filed by Peterman on February 25, 2025 (Docket No. 3) (the "Complaint"), which sought to deny Debtor's discharge under 11 U.S.C. § 727(a)(2)(A).[1]

The Court, having reviewed and considered the evidence admitted at the Trial and the other matters of record, having weighed the credibility of the witnesses, having reviewed *Plaintiff's Post-Trial Brief* filed on December 3, 2025 (Docket No. 34) ("Peterman's Brief") and *Defendant's Post-Trial Brief in Response to Plaintiff's Post-Trial Brief* filed on December 23, 2025 (Docket No. 37), as supplemented with the transcript of the trial (Docket Nos. 38 and 39), and being otherwise duly advised, now ENTERS the following findings of fact and conclusions of law as required by Fed. R. Civ. P. 52, made applicable to this adversary proceeding by Fed. R. Bankr. P. 7052.

## FINDINGS OF FACT

The Court makes the following findings of fact:

1.  Debtor was at all relevant times the sole member and manager of Ewebdata Enterprise, LLC ("Ewebdata"), an Indiana limited liability company.

2.  On or about June 27, 2022, Peterman and Ewebdata entered into an *Ewebdata Master Agreement* (the "Agreement"), by which Ewebdata provided sales leads to Peterman based on website visits. The original term of the Agreement was six months. Peterman agreed to pay $10,000/month for such services. Peterman gave Ewebdata Peterman's credit card account number, and Ewebdata charged Peterman's credit card for the monthly fee.

3.  Paragraph 12 of Exhibit A to the Agreement addresses "TERM AND TERMINATION". Paragraph 12(a) (the "Termination Clause") provides as follows:

    This Agreement will commence on the Effective Date and will remain in effect for an initial term as set forth on the SOW (the "Initial Term"). Thereafter, the

---

[1] Unless otherwise noted, all statutory references herein are to the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.*

    term of the Agreement shall renew as set forth on the SOW (each, a "Renewal Term," and collectively with the Initial Term, the "Term"), unless one Party provides written notice to the other Party at least ninety (90) days in advance of the end of the then-existing term that it does not wish to renew the Agreement.

  4. After the end of the initial six-month term, Ewebdata continued to provide leads to Peterman.

  5. Peterman's accounting department staff notified Matt Murray, Peterman's director of marketing and technology, that Ewebdata charged Peterman's credit card in January 2023.  On January 29, 2023, Mr. Murray contacted Debtor by email (the "January Email") with respect to such charge.  The email stated:

    Hi Roosevelt,

    As we've completed our initial 6-month term, we need to look at modifying this agreement moving forward.  We just simply haven't had the resources as of late to take advantage of this data and continuing to sink $10k/month into this just isn't a good use of our budget at current time.

    Let me know some options moving forward.

    Thanks!
    Matt

  6. The Court finds that the January Email does not evidence Peterman's intent to terminate the Agreement consistent with the requirements of the Termination Provision.[2]

  7. To provide "options moving forward" as requested in the January Email, in February 2023, there was a meeting, perhaps by telephone, in which Debtor on behalf of Ewebdata, Mr. Murray on behalf of Peterman, and Pam Prickett on behalf of ValPak (the person who initially introduced Peterman and Ewebdata) discussed an extension of the Agreement on a month-to-month basis.  Mr. Murray testified that he does not recall such meeting.  Debtor

---

[2]  During the trial, Mr. Murray acknowledged that the January Email did not say that Peterman was terminating the Agreement.

testified that, as a result of such meeting, there was an oral agreement to extend the term of the Agreement on a month-to-month basis. No other terms of such oral agreement were presented to the Court. Ewebdata continued providing services to Peterman after such meeting, but Peterman did not follow-up on the leads provided. Ewebdata continued to charge Peterman's credit card for such services.

8. In October 2023, Ewebdata sent an invoice to Peterman for $9,200. On October 28, 2023, Mr. Murray sent the following email (the "October Email") to Ewebdata:

> Hi,
>
> What is this for? We discontinued this at the beginning [of] 2023 …
>
> Matt Murray

The October Email began a chain by which Debtor explained the services Ewebdata was continuing to provide to Peterman. Peterman did not offer into evidence any email during the October 2023 exchange that refutes that Peterman was aware of Ewebdata's ongoing provision of services to Peterman.

9. While the October Email addresses Peterman's belief that the Agreement was no longer in effect, the Court finds that such belief was mistaken and that the October Email and the subsequent exchange do not evidence Peterman's intent to terminate the Agreement consistent with the requirements of the Termination Provision.

10. On April 3, 2024, Mr. Murray sent another email (the "April Email") to Ewebdata regarding Ewebdata's continuing to charge Peterman's credit card:

> Hi Roosevelt,
>
> Our accounting department has informed me that we are continuing to see charges from you on our MasterCard. We discontinued these services over a year ago. Please refund these charges immediately or we will be forced to charge them back via the bank.

> We are not interested in continuing to use your services and have not for over a year.
>
> Please confirm these charges have been stopped and when we should expect the refunds.
>
> Matt

11. The Court finds that the April Email does clearly evidence Peterman's intent to terminate the Agreement consistent with the requirements of the Termination Provision. Because the Agreement became a month-to-month agreement in February 2023, the 90-day advance notice provision of the Termination Clause was overridden, with termination becoming effective during April 2024.

12. Following the April Email, the email chain that followed described the parties' efforts to resolve Peterman's request for refunds in the April Email.

13. At no point during the trial did Peterman present evidence with respect to the amount or dates of payments it claims were wrongly charged by Ewebdata against Peterman's credit card. Paragraph 21 of the Complaint asserts that "[Debtor] continued to charge [Peterman's credit card] over a period of 17 months, totaling $174,212.00." Paragraph 22 of the Complaint asserts that "[Debtor] failed to charge the card $10,000.00 every month. Some months he charged the $10,000.00, while others he charged inexplicable amounts. For example, he charged the card:  $9,202.00 from March through August 2023; $9,2000.00 [*sic*] in September 2023; $9,800.00 in October 2023; and $15,000.00 in December 2023 and January 2024." In *Defendant's Answer to Plaintiff's Amended Complaint* filed on June 23, 2025 (Docket No. 16) (the "Answer"), Debtor responded to the assertions of § 21 of the Complaint as follows: "Denied.  Charges varied due to supplemental data recovery costs for enhanced hygiene services, which was communicated to Matt Murray and authorized under the scope of services." In the

Answer, Debtor responded to the assertions of § 22 of the Complaint as follows: "Denied. [Debtor] acted under the existing contract and provided continued services, including active lead delivery to ServiceTitan."

14. The Court finds that Peterman failed to satisfy its burden to prove the elements necessary to except the debt allegedly owed by Debtor to Peterman from Debtor's discharge pursuant to § 523(a)(2)(A) and (a)(6).

## CONCLUSIONS OF LAW

The Court makes the following conclusions of law:

A. Any finding of fact above will also be a conclusion of law, and any conclusion of law will also be a finding of fact, to support the judgment of the Court.

B. This Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1334 and 157.

C. This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

D. Venue is proper in this matter pursuant to 28 U.S.C. §§ 1408 and 1409.

E. Peterman seeks to have the debt allegedly owed by Debtor to Peterman determined to be nondischargeable pursuant to § 523(a)(2)(A) and (a)(6).

### Objection to Dischargeability of Debt – § 523

F. Exceptions to discharge under § 523 "are to be construed strictly against a creditor and liberally in favor of the debtor." *In re Zarzynski*, 771 F.2d 304, 306 (7th Cir. 1985). "The burden is on the objecting creditor to prove exceptions to discharge." *Goldberg Secs., Inc. v. Scarlata (In re Scarlata)*, 979 F.2d 521, 524 (7th Cir. 1992) (citation omitted). The burden of proof required is a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991).

  G. Section 523 provides, in relevant part:

(a) A discharge under section 727 … of this title does not discharge an individual debtor from any debt –
…
(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by –
(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
…
(6) for willful and malicious injury by the debtor to another entity or to the property of another entity … .

*§ 523(a)(2)(A)*

  H. In Count I of the Complaint, Peterman asserts that the debt allegedly owed by Debtor to Peterman is not subject to discharge pursuant to § 523(a)(2)(A). Peterman asserts that such debt is nondischargeable because, after telling "[Debtor] on more than one occasion to discontinue the alleged provision of information technology services after the expiration of the initial six-month term of the [Agreement]", … Debtor "continued to charge [Peterman's credit card] for more than a year after the expiration of the six-month initial term". (Peterman's Brief, p. 2.)

  I. The Seventh Circuit Court of Appeals distinguishes material differences among the three possible grounds for nondischargeability under § 523(a)(2)(A) and has formulated two different tests, one for both "false pretenses" and "false representation" and another for "actual fraud." *See Rae v. Scarpello (In re Scarpello)*, 272 B.R. 691, 699-700 (Bankr. N.D. Ill. 2002) (citing *McClellan v. Cantrell*, 217 F.3d 890, 894 (7th Cir. 2000)).

  J. To prevail on a nondischargeability claim under the "false pretenses" or "false representation" theory, a creditor must prove all of the following elements: "(1) the debtor made a false representation or omission, (2) that the debtor (a) knew was false or made with reckless

disregard for the truth and (b) was made with the intent to deceive, (3) upon which the creditor justifiably relied." *Ojeda v. Goldberg*, 599 F.3d 712, 716-17 (7th Cir. 2010) (citations omitted).

     K.     "What constitutes 'false pretenses' in the context of § 523(a)(2)(A) has been defined as 'implied misrepresentations or conduct intended to create and foster a false impression.' " *Mem'l Hosp. v. Sarama (In re Sarama)*, 192 B.R. 922, 927 (Bankr. N.D. Ill. 1996) (quoting *Banner Oil Co. v. Bryson (In re Bryson)*, 187 B.R. 939, 959 (Bankr. N.D. Ill. 1995) (quotations omitted)). "False pretenses do not necessarily require overt misrepresentations. Instead, omissions or a failure to disclose on the part of the debtor can constitute misrepresentations where the circumstances are such that omissions or failure to disclose create a false impression which is known by the debtor." *Id.* at 928 (citation omitted).

     L.     A "false representation" can be shown by the debtor's written statement, spoken statement or conduct. *Deady v. Hanson (In re Hanson),* 432 B.R. 758, 772 (Bankr. N.D. Ill. 2010) (citing *Bletnitsky v. Jairath (In re Jairath)*, 259 B.R. 308, 314 (Bankr. N.D. Ill. 2001)). "A debtor's failure to disclose pertinent information may be a false representation where the circumstances imply a specific set of facts and disclosure is necessary to correct what would otherwise be a false impression." *Id.* (citing *Trizna & Lepri v. Malcolm (In re Malcolm),* 145 B.R. 259, 263 (Bankr. N.D. Ill. 1992)). "An intentional falsehood relied on under § 523(a)(2)(A) must concern a material fact." *Scarpello*, 272 B.R. at 700 (citing *Jairath*, 259 B.R. at 314).

     M.     Justifiable reliance is an intermediate level of reliance which is less stringent than "reasonable reliance" but more stringent than "reliance in fact." *See Field v. Mans*, 516 U.S. 59, 72-73, 116 S.Ct. 437, 445, 133 L.Ed.2d 351 (1995). Justifiable reliance requires only that the creditor did not "blindly [rely] upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation" and

imposes no duty on the creditor to investigate unless the falsity of the representation is readily apparent. *Id.* at 71, 116 S.Ct. at 444 (quotations omitted). Justifiable reliance is not measured from the objective person standard, but rather from the experiences and characteristics of the particular creditor. *Id.* (quotation omitted).

N. "Scienter, or intent to deceive, is … a required element under § 523(a)(2)(A) whether the claim is for a false representation, false pretenses, or actual fraud." *Gasunas v. Yotis (In re Yotis)*, 548 B.R. 485, 495 (Bankr. N.D. Ill. 2016) (citation omitted).

O. A debtor's intent to deceive for purposes of the false pretenses and false representation prongs on § 523(a)(2)(A) "is measured by a debtor's subjective intention at the time the representation was made." *Scarpello*, 272 B.R. at 700 (citing *Mercantile Bank v. Canovas*, 237 B.R. 423, 428 (Bankr. N.D. Ill. 1998)). "Because direct proof of fraudulent intent is often unavailable, fraudulent intent may be inferred from the surrounding circumstances." *Hanson*, 432 B.R. at 773 (internal citations omitted).

P. "[A]ctual fraud is broader than misrepresentation," *McClellan*, 217 F.3d at 893, in that neither a debtor's misrepresentation nor a creditor's reliance is necessary to prove nondischargeability for "actual fraud." *Scarpello*, 272 B.R. at 700 (citing *McClellan*, 217 F.3d at 894). "Actual fraud" is defined as "any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another" which includes "all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated." *McClellan*, 217 F.3d at 893 (quotations omitted). *See also Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 356, 359-60, 136 S.Ct. 1581, 1586, 194 L.Ed.2d 655 (2016) ("The term 'actual fraud' in § 523(a)(2)(A) encompasses forms of fraud … that can be effected without a false representation. … The word 'actual' has a simple meaning in the context of common-law fraud: It denotes any fraud that

'involv[es] moral turpitude or intentional wrong.' … [A]nything that counts as 'fraud' and is done with wrongful intent is 'actual fraud.' ") (internal citation omitted).  In such cases, a creditor must prove "(1) a fraud occurred; (2) the debtor intended to defraud the creditor; and (3) the fraud created the debt that is the subject of the discharge dispute." *Hanson*, 432 B.R. at 772 (citing *McClellan*, 217 F.3d at 894).

Q.   "[T]he focus of an 'actual fraud' claim is on the defendant's state of mind at the time of his purportedly fraudulent conduct." *Merritt v. Wiszniewski (In re Wiszniewski)*, 2010 WL 3488960 at *5 (Bankr. N.D. Ill. 2010) (citation omitted).

R.   An exception to discharge under § 523(a)(2)(A) "encompasses any liability arising from money, property, etc., that is fraudulently obtained, including treble damages, attorney's fees, and other relief that may exceed the value obtained by the debtor." *Cohen v. De La Cruz*, 523 U.S. 213, 223, 118 S. Ct. 1212, 1219, 140 L.Ed.2d 341 (1998).

S.   Peterman failed to prove by requisite evidence that Debtor obtained any money or property from Peterman by actual fraud, false pretenses or a false representation that Peterman reasonably relied upon to its detriment.  Peterman did not terminate the Agreement, consistent with the Agreement's requirements for termination, until April 3, 2024 when Mr. Murray sent the April Email.  Charging for its services while the Agreement was in effect does not amount to fraudulent or falsely obtaining Peterman's money or property.  Peterman did not introduce evidence of any payment that was charged to Peterman's credit card by Ewebdata after the effective termination of the Agreement.

T.   Therefore, the Court concludes that Peterman failed to satisfy its burden to prove the elements necessary to except the debt allegedly owed by Debtor to Peterman from Debtor's discharge pursuant to § 523(a)(2)(A).

*§ 523(a)(6)*

U.	In Count II of the Complaint, Peterman asserts that the debt allegedly owed by Debtor to Peterman is not subject to discharge pursuant to § 523(a)(6). Peterman asserts that such debt is nondischargeable because Debtor injured Peterman "by depriving it of its money without any justification or legal right to it – again, there was no contract in place after the expiration of the initial six-month term. By taking [Peterman's] money after repeatedly being told not to, [Debtor]'s injury to [Peterman] was undoubtedly willful" and "in conscious disregard of his duty not to, having repeatedly been told not to." (Peterman's Brief, pp. 3-4.)

V.	A debt may be excepted from discharge pursuant to § 523(a)(6) "for willful and malicious injury by the debtor to another entity or to the property of another entity". "Bankruptcy courts in [the Seventh Circuit] have focused on three points: (1) an injury caused by the debtor (2) willfully and (3) maliciously." *First Weber Group, Inc. v. Horsfall*, 738 F.3d 767, 774 (7th Cir. 2013) (citations omitted).

W.	Injury "is understood to mean a 'violation of another's legal right, for which the law provides a remedy.' The injury need not have been suffered directly by the creditor asserting the claim. The creditor's claim must, however, derive from the other's injury." *Id.* (internal citations omitted).

X.	"Willfulness requires 'a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury.' " *Id.* (quoting *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S.Ct. 974, 977, 140 L.Ed.2d 90 (1998) (emphasis in original)). " 'Willfulness' can be found either if the 'debtor's motive was to inflict the injury, or the debtor's act was substantially certain to result in injury.' " *Id.* (quotation omitted).

Y.	Maliciousness requires the debtor to act "in conscious disregard of one's duties or

without just cause or excuse; it does not require ill-will or specific intent to do harm." *In re Thirtyacre*, 36 F.3d 697, 700 (7th Cir. 1994) (quotation omitted). The Seventh Circuit reaffirmed its definition of maliciousness from *Thirtyacre* as good law. *Horsfall*, 738 F.3d at 774-75.

      Z.      Peterman failed to prove by requisite evidence that Debtor caused an injury to Peterman by Debtor's willful and malicious action. Ewebdata reasonably believed that the Agreement was in effect, on a month-to-month basis, after the initial six-month term and until the Agreement was properly terminated in April 2024, and continued to perform services for Peterman thereafter. Charging for its services while the Agreement was in effect does not amount to a willful and malicious injury to Peterman. Peterman did not introduce evidence of any payment that was charged to Peterman's credit card by Ewebdata after the effective termination of the Agreement.

      AA.      Therefore, the Court concludes that Peterman failed to satisfy its burden to prove the elements necessary to except the debt allegedly owed by Debtor to Peterman from Debtor's discharge pursuant to § 523(a)(6).

## Decision

For the reasons described above, Peterman has failed to prove that a basis exists for excepting Peterman's claim from Debtor's discharge.

The Court will enter judgment in favor of Debtor and against Peterman consistent with these findings of fact and conclusions of law contemporaneously herewith.

### # # #